POSNER, Circuit Judge.
 

 We are asked in this interlocutory appeal by the Grand Trunk Corporation to decide whether the district court that is presiding over the reorganization in bankruptcy of the Milwaukee Road (the Chicago, Milwaukee, St. Paul and Pacific Railroad Company) erred in allowing the Soo Line Railroad Company (1) to join the bidding competition for the Milwaukee Road’s remaining railroad assets and (2) to submit its bid under section 5(b) of the Milwaukee Railroad Restructuring Act, which establishes procedures for the sale of rail lines of the Milwaukee Road but, the Grand Trunk argues, not for the sale of the Milwaukee Road’s entire remaining rail business. We must first decide an issue of appellate jurisdiction and then, depending on how we resolve that issue, consider the interrelationship of section 5(b) of the Milwaukee Act, 45 U.S.C. § 904(b), the line-acquisition and corporate-control (merger and consolidation) provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10901 and 11343-11345, respectively, and section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976 ed.). Although section 77 has been repealed, it remains applicable to proceedings filed under it before the repeal. See Bankruptcy Reform Act of 1978, Pub.L. 95-598, Title IV, § 403(a), 92 Stat. 2683.
 

 In 1977 the Milwaukee Road, then the country’s seventh largest railroad, sought shelter under section 77. It became;-apparent that to avoid complete collapse the railroad would have to sell or abandon at least two-thirds of its lines. The difficulty was that under the rules of the Interstate Commerce Commission any purchaser of those lines would be required to assume astronomical financial obligations to the workers made redundant by the purchase. It seemed .the only way out was for the district court presiding over the reorganiza
 
 *510
 
 tion to “embargo” (authorize cessation of operations on) the lines the Milwaukee wanted to get rid of, in the hope that the Commission could be bypassed in this way. When we upheld the embargo,
 
 In re Chicago, M., S.P. & P.R.R.,
 
 611 F.2d 662, 668-70 (7th Cir.1979) (per curiam), a major shutdown of rail service was imminent and Congress promptly stepped in and passed the Milwaukee Railroad Restructuring Act. See
 
 In re Chicago, M., S.P. & P.R.R.,
 
 713 F.2d 274, 277-78 (7th Cir.1983).
 

 The trustee of the Milwaukee Road proceeded to dispose of lines piecemeal till only a third of the original lines were left, but even in its shrunken state the Milwaukee Road is a substantial operating railroad with more than 3,000 miles of track and more than $300 million in annual revenues. In 1981 the Grand Trunk Railway expressed interest in buying what was left of the railroad. (The Milwaukee Road also has real estate and other nonrail assets, but they will remain with the reorganized corporation when it emerges from bankruptcy.) The trustee agreed with the Grand Trunk to coordinate the services of the two railroads in the hope of improving service and reducing costs and later agreed to sell the common stock of the Milwaukee Road to the Grand Trunk subject to the district court’s approval.
 

 The trustee filed an amended plan of reorganization with the district court, recommending approval of the sale, and the court referred the matter to the Interstate Commerce Commission for consideration under the corporate-control provisions of the Interstate Commerce Act. Under these provisions the Commission “shall require” that inconsistent applications for a merger or consolidation between two Class I railroads be filed within 90 days, 49 U.S.C. § 11345(b)(2), and the district court imposed the same deadline for any inconsistent plan of reorganization. This meant that such a plan would have to be filed with the court and Commission no later than July 27, 1983. On that day the Chicago and North Western Railroad submitted to the court and the Commission an inconsistent plan of reorganization whereby it rather than the Grand Trunk would buy the Milwaukee Road. The Soo did not enter the picture till August 1983, when it told the district court that it was planning to ask the court’s permission to propose its own plan; and it was not until January 1984 that the Soo asked for an extension of time to file its plan and also for authorization to buy the Milwaukee Road under section 5(b) of the Milwaukee Railroad Restructuring Act. Section 5(b)(1) empowers the district court to “authorize the sale or transfer of a line of the Milwaukee Railroad to be used in continued rail operations, subject to the approval of the Commission under” section 5(b)(2), which allows the court to approve the sale or transfer if the Commission either approves it or takes no action on it within 180 days.
 

 In February and March 1984 the court granted both of the Soo’s requests and referred its application to the Commission, and it is these actions by the district court that the Grand Trunk is trying to appeal to us. The Commission obligingly waived its 90-day deadline for the Soo and permitted the Soo to proceed under section 5(b). The Grand Trunk and the C & NW then filed their own section 5(b) applications — the Grand Trunk under protest. The Commission processed the three applications under the same standards it uses for evaluating a proposed railroad merger or consolidation, only did so within 180 days as required by section 5(b). In September 1984 the Commission announced that it had approved the Soo’s offer but had disapproved the Grand Trunk’s and had taken no action on the C
 
 &
 
 NW’s.
 
 Chicago, M., S.P. & P.R.R.
 
 — Reor
 
 ganization
 
 — Acquisition
 
 by Grand Trunk Corp.,
 
 Fin.Dkt. No. 28640 (Sub-No. 9). The Commission estimated that the Soo and C & NW offers were each worth about $570 million, compared to $410 million for the Grand Trunk’s. See
 
 id.
 
 at p. 54. In December, after the C & NW had further sweetened its offer, the Commission decided to approve that offer too. The Commission’s decisions put the ball back in the district court, which after holding hearings on the question whether to approve the
 
 *511
 
 sale of the Milwaukee Road to the Soo or the C & NW announced on February 8, 1985, that it was approving the sale to the Soo.
 

 Section 24(a) of the Bankruptcy Act of 1898, 11 U.S.C. § 47(a) (1976 ed.), gives us appellate jurisdiction over “proceedings in bankruptcy, either interlocutory or final, and in controversies arising in proceedings in bankruptcy,” with limitations not pertinent here. This confusing wording, making an interlocutory proceeding appealable but not an interlocutory controversy, without indicating what the difference between a “proceeding” and a “controversy” is, has been the source of endless difficulties, though it may be hoped that this appeal will be one of the last occasions on which the issue must be faced. For the Bankruptcy Act enacted in 1978 and amended in 1984 has eliminated the distinction. Under the new act, interlocutory orders by bankruptcy judges are appealable to the district court, but only with the district court’s permission; and only final decisions by the district court are appealable to the court of appeals. See 28 U.S.C.A. §§ 158(a), (d) (West Supp. Sept. 1984);
 
 In re Riggsby,
 
 745 F.2d 1153 (7th Cir.1984).
 

 A “controversy” under section 24(a) is basically a claim — a neatly severable dispute within the overall framework of the bankruptcy proceeding, much like a separate lawsuit — to which the normal requirement of finality is fully suitable. A tort claim against the bankrupt would be a good example; it is functionally a small lawsuit nested in the overall bankruptcy proceeding. A proceeding, in contrast, has reference to the actual administration of the bankrupt estate. Put differently (and not entirely precisely), a controversy relates to disputes with actual or potential creditors over dividing up the pie represented by the bankrupt estate, while a proceeding relates to disputes over trying to make the pie as big as possible. See, e.g.,
 
 Citibank, N.A. v. Fullam,
 
 580 F.2d 82, 88-89 (3d Cir.1978); cf.
 
 Taylor v. Voss,
 
 271 U.S. 176, 180-81, 46 S.Ct. 461, 463, 70 L.Ed. 889 (1926). Alternatively, the statutory term “interlocutory proceedings” can be read to make interlocutory orders in the bankruptcy proceeding itself, as opposed to orders finally disposing of separable controversies, appealable. Read either way, section 24(a) creates the prospect that most of the hundreds of orders that a court issues in the course of a protracted reorganization such as this one (now in its eighth year) are appealable as a matter of right. It is an ominous prospect; the orders that the Grand Trunk has appealed are numbered 730 and 736. It might mean that if a party wanted to file an oversized brief that was not related to a “controversy,” and the district court refused to let him, he could appeal to us.
 

 The courts have avoided this ridiculous result by reading into section 24(a) an exception for “trivial orders.” See, e.g., 9 Moore’s Federal Practice 11110.15[5], at p. 226 (2d ed. 1983). If the “trivial order” doctrine seems rather a bold exercise in judicial rewriting of unequivocal statutory language, it can nevertheless be defended by noting that orders in bankruptcy proceedings, whether interlocutory or final, originally were appealable only with the permission of the court of appeals. This requirement was used to screen out the trivial orders; and though it was not by inadvertence that the Chandler Act of 1938, 52 Stat. 854, eliminated (unless the amount in dispute was less than $500) the requirement of getting the court of appeals’ permission to appeal, see S.Rep. No. 1916, 75th Cong., 3d Sess. 4 (1938);
 
 Dickinson Industrial Site, Inc. v. Cowan,
 
 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940), there is no reason to suppose that Congress wanted to eliminate our discretion so completely as to make us review every order, however trivial, pertaining to a bankruptcy dispute over $500. In any event the doctrine is too well settled for us to consider overturning it in the twilight of section 24(a).
 

 If “trivial order” means what it says, there is no doubt that the orders sought to be appealed in this case are appealable. Far from being trivial, if not reversed they will cost the Grand Trunk its chance to
 
 *512
 
 acquire the Milwaukee Road for many millions of dollars less than its rival bidders offered. Most cases apply the doctrine as if it really were limited to “trivial orders,” and therefore uphold the appealability of orders no more (and often less) consequential than those before us. See, e.g.,
 
 In re Cantwell,
 
 639 F.2d 1050, 1053 (3d Cir.1981) (order dissolving stay of discharge);
 
 In re Duplan Corp.,
 
 591 F.2d 139, 144 (2d Cir.1978) (Friendly, J.) (refusal to strike answer, thereby deciding “a procedural question of significance”);
 
 In re W.F. Breuss, Inc.,
 
 586 F.2d 983, 985-86 (3d Cir.1978) (order, deemed trivial by dissent, see
 
 id.
 
 at 987-89, denying motion to quash subpoena);
 
 In re Continental Mortgage Investors,
 
 578 F.2d 872, 877 (1st Cir.1978) (adjudication of bankruptcy, described “as an order which substantially decided a step in the course of the Chapter XI proceedings”);
 
 In re Homer Arth Well No. 1,
 
 529 F.2d 1272, 1273-74 (6th Cir.1976) (appointment of trustee). Although
 
 In re Chotiner,
 
 218 Fed. 813 (3d Cir.1914), turned down an appeal from an order refusing to confirm a referee’s sale of the bankrupt’s assets, thus leaving them in the hands of the trustee, and that order has a definite family resemblance to the orders in this case (which in effect refuse to enforce the contract between the trustee and a third party to sell the bankrupt’s assets to it),
 
 Chotiner
 
 was decided at a timé when interlocutory appeals in bankruptcy proceedings were allowable only in the discretion of the court of appeals. We can hardly quarrel with the Third Circuit’s refusal to exercise its discretion in the circumstances before it— especially since those circumstances are not described in its extremely brief opinion.
 

 Some cases, however, expand the “trivial orders” doctrine — in two directions. One is to forbid even non-trivial orders to be appealed if “no matter at all peculiar to bankruptcy administration is presented” — such as the order to disqualify counsel in
 
 In re Continental Investment Corp.,
 
 637 F.2d 1, 4 (1st Cir.1980), from which this quotation is taken. This is not such a case. Another line of cases, led by
 
 In re Durensky,
 
 519 F.2d 1024, 1029 (5th Cir.1975), refuses to allow an appeal to be taken from a district court’s order either remanding a matter to the bankruptcy court for further proceedings or postponing consideration of the matter by the district court. Such orders are not trivial in the sense of dealing with inconsequential matters such as the length of a brief, but as they do not definitively resolve even the issue on which appellate review is sought, they could be said to be trivial as to consequence. See
 
 In re Bacchus,
 
 718 F.2d 736 (5th Cir.1983) (per curiam);
 
 In re Abingdon Realty Corp.,
 
 634 F.2d 133 (4th Cir.1980) (per curiam);
 
 In re Lloyd, Carr & Co.,
 
 614 F.2d 17, 20 (1st Cir.1980);
 
 Good Hope Refineries, Inc. v. Brashear,
 
 588 F.2d 846, 848 (1st Cir.1978). An example would be an order denying a motion for summary judgment that resolved no legal issue — that still allowed the movant to prove his case at trial — but merely found that there were genuine issues of material fact; or a remand of the case to the bankruptcy judge because he had committed trial error. The orders in this case, however, finally resolve the right of the Soo to join the bidding for the Milwaukee Road and to bid under section 5(b) rather than being forced to comply with the usual requirements applicable to the purchase of a railroad.
 

 Although many of the cases in this line quote the test of nontrivial order that the Fifth Circuit used in
 
 Durensky
 
 —whether the order has “definitive operative finality,” 519 F.2d at 1029 — the word “finality” in this quotation refers not to the finality of the case but to the finality of the issue involved in the interlocutory order. If the order postpones rather than finally decides the issue, it is not appealable, in just the same way that interlocutory orders denying, in the sense of postponing decision on, applications for injunctions are not appealable under 28 U.S.C. § 1292(a)(1) despite the apparently unequivocal language of that statutory exception to the final-judgment rule. See, e.g.,
 
 Switzerland Cheese Ass’n, Inc. v. E. Horne’s Market, Inc.,
 
 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966);
 
 Donovan v. Robbins,
 
 
 *513
 
 752 F.2d 1170, 1172-76 (7th Cir.1985). If “finality” in
 
 Durensky
 
 referred to the whole case rather than the issue, the “trivial orders” doctrine would establish a test of finality under section 24(a) even more rigorous than that of 28 U.S.C. § 1291, the final-judgment rule itself. This cannot be right; it would read the word “interlocutory” right out of section 24(a). Admittedly one can find some judicial language which seems to do just that. See
 
 In re Covington Grain Co.,
 
 638 F.2d 1357, 1360 and n. 1 (5th Cir.1981) (equating “operative finality” under the Fifth Circuit’s interpretation of section 24(a) with the collateral-order doctrine of
 
 Cohen v. Beneficial Industrial Loan Corp.,
 
 337 U.S. 541, 546-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949)—a doctrine of interpretation of 28 U.S.C. § 1291);
 
 In re Brissette,
 
 561 F.2d 779, 782 (9th Cir.1977) (limiting appeal to “interlocutory decisions [that] may effectively determine the ultimate outcome or finally resolve rights and duties of parties in a manner not susceptible to meaningful review on appeal from the final judgment”). But general language in judicial opinions is not meant to be taken literally or to be applied in contexts remote from that in which it was originally used.
 

 One court fond of the expression “definitive operative finality” has recognized, moreover, an exception for “extraordinary circumstances—perhaps a substantial question of jurisdiction or law.”
 
 Good Hope Refineries, Inc. v. Brashear, supra,
 
 588 F.2d at 848. This case fits that exception. It is in its eighth year, and involves the disposition of assets worth hundreds of millions of dollars. If the district judge’s order admitting the Soo to the bidding and allowing it to proceed under section 5(b) of the Milwaukee Railroad Restructuring Act cannot be appealed, a big cloud will hang indefinitely over the sale of the Milwaukee Road’s remaining rail assets. Even more important is what the “extraordinary circumstances” exception of the
 
 Brashear
 
 opinion is an exception to. It is an exception to the principle that the issue involved in the interlocutory appeal must have been decided definitively by the district court. If it was decided definitively, it is appeala-ble. That condition is met here too, as we have seen.
 

 The first question on the merits of the appeal is whether the district court was wrong to allow the Soo to put in a bid for the Milwaukee Road several months after the July 27, 1983, deadline that the court had set. The Grand Trunk argues that the court lacked the power to extend the deadline without a showing of “excusable neglect,” the test of Bankruptcy Rule 906 for extensions of time in bankruptcy proceedings. But that rule is inapplicable to railroad reorganizations. See Bankruptcy Rule 8-703(b). Section 77(d) expressly authorizes the filing of alternative plans of reorganization—if as here the Interstate Commerce Commission consents—while hearings on other plans are going on in the Commission, which is the stage at which the Soo filed its plan. Although Rule 8-301(b) allows the filing of an alternative plan with the court only until the first plan has been transmitted to the Commission, the Advisory Committee’s Note explains that “after transmission of a plan to the Commission, the Commission [i.e., rather than the court] determines whether any additional plans or modifications may be filed with it,” as section 77(d) provides. The Commission determined in the Soo’s favor.
 

 Although the district judge violated no rigid deadline in the Bankruptcy Act, he could not without some reason extend the deadline he had set. But considering the potential benefits to the bankrupt estate of allowing the consideration of the Soo’s belated but apparently munificent bid (which in turn spurred the C & NW to sweeten its bid), we cannot say the district judge was unreasonable to allow the bidding to be reopened several months after his deadline had passed. Of course it is important that potential bidders know when the bidding will really close; and it is true as the Grand Trunk argues that the prospect of a protracted auction can discourage initial bids— an early bidder would know that late
 
 *514
 
 comers will use the information that went into the preparation of his bid to help them to prepare winning bids. But since section 77(d) allows late bidders to propose alternative plans of reorganization, and these plans might conceivably include a section 5(b) sale as a component, the Grand Trunk was not unfairly surprised by the Soo’s entry into the bidding while the Grand Trunk’s plan was before the Commission. Nor can we say that prices in future reorganizations will be reduced because the district judge allowed the Soo to enter the bidding after its apparent conclusion, or that the Grand Trunk has shown detrimental reliance such as might make the district judge’s action in reopening the bidding inequitable — beyond its natural disappointment at being deprived of what may have been a great bargain.
 

 The Grand Trunk also complains about the Commission’s extension of the 90-day deadline in 49 U.S.C. § 11345(b)(2) for submitting inconsistent applications for a consolidation of Class I railroads. The deadline had passed when the Soo submitted its application, but the Commission waived it, as its regulations allow it to do. See 49 C.F.R. § 1180.4(f). Whether the Commission could properly do this may not seem a proper issue in this appeal, which is not from any order of the Commission. But the deadline had passed when the court issued the orders that are before us in this appeal, and the Grand Trunk argues that the district court had no business accepting a proposal that the Commission no longer had any authority to consider.
 

 Although the Soo’s application for a waiver of the statutory 90-day deadline was in fact untimely under the Commission’s regulation, the Grand Trunk has waived any objection to the Commission’s compliance with the regulation by not even citing it. And although its argument that the Commission has no power to waive the statutory deadline is implicitly a challenge to the validity of the regulation, we are disinclined to hold, in the absence of evidence that Congress meant the deadline not to be waivable in any circumstances (the issue is not mentioned in the legislative history), that it can never be waived when the acquisition is of a bankrupt railroad. It seems unlikely that Congress wanted to impose such a rigid limitation on the Commission’s ability to assist the bankruptcy court in disposing of the bankrupt’s assets on the best possible terms. The statute says not that the alternative plan must be submitted within 90 days but that the Commission “shall require” that it be submitted within that period. The imposition of the deadline is delegated to the Commission, implying some scope for flexible administration of what is after all a very tight deadline. And it is particularly unlikely that Congress would have wanted someone in the Grand Trunk’s position — a disappointed bidder, whose only interest is in buying the bankrupt’s assets at a low price — to be empowered to enforce it to the prejudice of the bankrupt’s creditors.
 

 All this assumes that the Commission was proceeding under the control sections of the Interstate Commerce Act, the sections to which the deadline applies, rather than under 49 U.S.C. § 10901(a)(3), which governs the acquisition of lines and has no deadline. Although it would do no violence to the language of that section to apply it to the acquisition of all the lines of a railroad (any more than it would do violence to the language of section 5 of the Milwaukee Act to impress a similar interpretation on it — as we shall see shortly), the history of the provision indicates, and courts and the Commission have frequently stated, that section 10901(a)(3) does not apply to acquisitions
 
 by other railroads
 
 of lines that are in service; instead the control sections apply. See, e.g., 49 C.F.R. § 1150(a);
 
 Terminal Ry. Alabama State Dock
 
 s—Opera
 
 tion, Mobile, At,
 
 354 I.C.C. 747, 750 (1978);
 
 In re Chicago, M., S.P. & P.R.R.,
 
 658 F.2d 1149, 1169-70 (7th Cir.1981);
 
 Railway Labor Executives Ass’n v. ICC,
 
 735 F.2d 691, 702 n. 12 (2d Cir.1984) (Friendly, J.);
 
 In re Valuation Proceedings, Etc.,
 
 531 F.Supp. 1191, 1265-67 (Special R.R.R. Act Ct.1981) (per curiam). The issue has arisen, however, chiefly in connection with labor-protection conditions, a distinct problem. But
 
 *515
 
 we need not trace out the boundary (on which see, e.g.,
 
 Illinois v. United States,
 
 604 F.2d 519, 524-25 (7th Cir.1979)) between the line-acquisition and corporate-acquisition provisions, as it is enough that in waiving the 90-day deadline under the latter the Commission did not violate the law — at least did not violate any legally protected rights of the Grand Trunk.
 

 The main issue on the merits is whether the district court could allow bidders for the Milwaukee Road’s remaining assets to proceed under section 5(b) of the Milwaukee Railroad Restructuring Act. Section 77(d) of the Bankruptcy Act of 1898 requires the Commission to hold hearings on a proposed plan of reorganization, to decide whether it complies with the public interest as well as with the specific provisions of the railroad reorganization sections of the Bankruptcy Act, and to embody its findings in a written report approving or disapproving the plan. Since section 77(f) requires that the reorganization plan be “not inconsistent with the provisions and purposes of the Interstate Commerce Act as now or hereafter amended,” 11 U.S.C. § 205(f) (1976 ed.); see
 
 St. Joe Paper Co. v. Atlantic Coast Line R.R.,
 
 347 U.S. 298, 303-09 and n. 8, 74 S.Ct. 574, 577-80 and n. 8, 98 L.Ed. 710 (1954), the standard used by the Commission to evaluate a railroad consolidation proposed in a plan for reorganization is the standard set forth in the provisions of the Interstate Commerce Act pertaining to railroad mergers and consolidations — and the Commission used that standard here, which may appear to make the Grand Trunk’s challenge moot. It is true that the Milwaukee Act gives the Commission slightly less authority than it would otherwise have over the acquisition of a bankrupt railroad, because under section 5(b) the district court can approve the acquisition not only if the Commission approves it but also if the Commission takes no action. But this point is quite academic here, since the Commission eventually acted on all three applications before it, approving two and turning down the third (the Grand Trunk’s). It is also true that the Commission has only 180 days to decide whether to approve an application under section 5(b); the deadlines under the control provisions of the Interstate Commerce Act are less stringent. See 49 U.S.C. § 11345(b)(3). But since the Commission disposed of the applications within 180 days, it is hard to see what difference the deadline made.
 

 Maybe, though, the Commission would have decided the merits of the applications differently if it had had more than 180 days to act on them. And maybe the district judge would not have allowed the Soo to file a late application if the Soo had merely been filing a conventional plan of reorganization rather than invoking the quick procedure of section 5(b). And if the Soo had not been allowed to file its plan the Commission probably would not have disapproved the Grand Trunk’s proposal, for the C & NW’s original bid (before it was sweetened in response to the Soo’s filing) was lower than the Grand Trunk’s. The question whether section 5(b) is available for a sale of what is left of the Milwaukee Road’s railroad business therefore is not moot; and let us turn to it.
 

 Section 5(b)(1) empowers the district court to “authorize the sale or transfer of a line of the Milwaukee Railroad to be used in continued rail operations,” subject of course to the Commission’s approval under section 5(b)(2). Although what the Soo proposed to buy was not a single line but all of the Milwaukee Road’s remaining lines, the Grand Trunk is not arguing that the use of the singular “line” has operative significance, so that a proposal to buy more than one line at once would have to be rejected and the offeror told to repackage his proposal as a set of proposals equal in number to the number of lines that he wanted to buy. The precept that “in determining the meaning of any Act of Congress, unless the context indicates otherwise ... words importing the plural include and apply to several ... things,” 1 U.S.C. § 1, is applicable here. Grand Trunk’s argument is that the acquisition of a line or lines, the only thing contemplated by section 5(b), is not the same thing as the acquisition of an
 
 *516
 
 entire railroad. But suppose the Milwaukee Road had started out with 100 lines, and sold 99 of them to 99 different purchasers, so that it had only one line left. And suppose the Soo had applied under section 5(b) to acquire that last line. Since that line would represent the entirety of the Milwaukee Road’s railroad business, the logic of the Grand Trunk’s argument is that the Soo could not proceed under section 5(b) even though the proposed acquisition would be identical to the acquisitions that had gone before, without controversy, under section 5(b).
 

 To avoid taking so extreme a position, the Grand Trunk concedes both that multiple lines can be acquired in one transaction under section 5(b) and that the last line can be acquired under section 5(b); on its view only the acquisition of the last lines, as proposed here, is outside the scope of section 5(b). But what is left of the Milwaukee Road is only a third of the system it had when it entered bankruptcy in 1977; and suppose the other two-thirds had been sold off in two equal chunks. These acquisitions would on the Grand Trunk’s view be permissible under section 5(b) as acquisitions of multiple lines rather than of an entire railroad business. It just argues that whichever third is acquired last cannot be acquired under section 5(b) because by definition the remaining portion of the railroad is the enterprise itself. We have difficulty understanding the relationship of this argument to the objectives of the Milwaukee Railroad Restructuring Act.
 

 Section 5(b) seeks to facilitate the reorganization of the Milwaukee Road (and a parallel provision of the Milwaukee Act, § 17(b), 45 U.S.C. § 915(b), does the same for other bankrupt railroads) by expediting the Interstate Commerce Commission’s consideration of the bankrupt’s applications for permission to abandon or sell lines, and by reducing somewhat the Commission’s authority over abandonments and sales by allowing them to go forward even if the Commission takes no action. See 125 Cong.Rec. 30872 (1979) (remarks of Congressman Madigan, one of the floor managers of the bill approved by the conference). This objective applies as much to the last line (or group of lines) that is abandoned or sold as to the first one (or group). There might seem to be a greater urgency about getting rid of the least-used lines of the system than about finding a purchaser for what, judging by the bids, is a potentially valuable core system; and this distinction might be important if the first act of the reorganization had been the sale of the entire railroad in its pristine state to another railroad (though that was not envisaged), or if section 5(b) allowed a dramatic short-circuiting of normal procedures. But the proposal is to sell a third of the railroad after the other two-thirds have been disposed of in section 5(b) proceedings whose propriety no one has questioned. When Congress passed the Milwaukee Act, it was feared that the Milwaukee Road might have to get rid of three-fourths of its lines. See H.R.Rep. No. 225, 96th Cong., 1st Sess. 2 (1979), U.S.Code Cong. & Admin.News 1979, pp. 1742, 1743. The trustee might have disposed of the vast bulk of its rail assets through section 5(b) proceedings, making it close to academic whether the last act had to take place under a different statute and unlikely that Congress would have insisted on this refinement.
 

 And refinement it would be. The Commission followed the same procedures it would have followed in a conventional proceeding to acquire a railroad — only did it within 180 days. This should be enough time to allow an adequate ventilation of the issues, and if it is not, then the district judge, whose duties under section 77(d) to evaluate plans of reorganization are not abrogated by section 5(b), can hold additional hearings. While the sale of a line (or lines) is normally a less consequential transaction than the acquisition of an entire (even if shrunken) business, and therefore a more careful scrutiny of the latter than of the former will often be required, if it is required it will be accorded.
 

 The Grand Trunk’s effort to confine section 5(b) to acquisitions of single lines or a few lines rather than the remainder of the system by analogy to the distinction be
 
 *517
 
 tween sections 10901 and 11343 also fails. The distinction is not between small and large acquisitions but, as we have seen, between acquisitions by rail and by nonrail buyers. Thus the use of section 5(b) is not an end run around this distinction; the Commission followed the procedure it would have used in a section 11343 case (and hence also satisfied the “consistency clause” of section 77(f)). And it would be absurd to think that because section 10901 and section 5(b) are both about line acquisitions, section 5(b) like section 10901 is usable only when the acquiring firm is not a railroad or the line has already been abandoned. Congress could not have thought that the principal purchasers of lines of the Milwaukee Railroad would not be railroads or have wanted to make the Milwaukee Road abandon lines before they could be acquired under the expeditious procedure of section 5(b).
 

 Affirmed.