EASTERBROOK, Circuit Judge.
The Chicago, Milwaukee, St. Paul & Pacific R.R. entered bankruptcy proceedings in 1977. In February 1985 the district court approved the sale of the Milwaukee’s railroad assets to the Soo Line R.R. for $571 million. That sale has produced myriad issues. We consider today whether the order approving the sale gave the Soo Line unencumbered title to 21 miles of track between Crivitz and Marinette, Wisconsin.
This line runs east-west and connects longer north-south lines of the Chicago & North Western R.R. (CNW) and the Escanaba & Lake Superior R.R. In 1982 the Escanaba purchased from the Trustee of the Milwaukee a line of track from Green Bay, Wisconsin, north to Iron Mountain, Michigan. Crivitz is on the Green Bay— Iron Mountain line about mid-way between these cities. The sale of the Green Bay— Iron Mountain line left the Crivitz — Marinette line in the Milwaukee’s hands, but as it connected the Escanaba’s line to a line of the CNW, the Milwaukee’s position was precarious. The Milwaukee therefore secured “trackage rights” (that is, the right to operate trains) on the Green Bay — Crivitz portion of the Escanaba’s line. These rights enabled the Milwaukee’s trains to reach Crivitz, from which they could reach Marinette and from there Menominee. (The Milwaukee had a trackage rights agreement with the CNW permitting travel from Marinette to Menominee.) The Crivitz — Marinette line affords shippers in these cities the benefit of competition between the Milwaukee and the CNW.
The Escanaba and the Trustee signed a “trackage rights agreement” allowing the Milwaukee to use the line between Green Bay and Crivitz and establishing detailed conditions and rates of payment for the use. Section 19.2 of this agreement provides that if the Milwaukee offers for sale the Connecting Line (defined as the Crivitz — Marinette line plus the Marinette— Menominee trackage rights), the Escanaba *833 “shall have a right of first refusal to purchase the Connecting Line.” The agreement requires the Milwaukee to notify the Escanaba of any offer and gives the Escanaba 60 days to enter into an agreement “under the same terms and conditions”. If the Escanaba declines to match the offer, the Milwaukee may sell as it pleases. Section 24.1 provides that disputes between the parties “in connection with” the agreement shall be arbitrated.
The Milwaukee transferred the Connecting Line to the Soo as part of its whole railroad. Order No. 809, which approved the sale, transfers the “rail assets” of the Milwaukee to the Soo “free and clear of all liens, security interests, claims and encumbrances, of whatever nature, whenever arising, ... except only liens, security interests, claims and encumbrances created by, or specifically permitted to remain on the Rail Assets pursuant to” the “asset purchase agreement.” The asset purchase agreement is a detailed specification of the terms and conditions of the transfer, to which we return. The idea was to transfer to the Soo the rail operations and related assets of the Milwaukee while leaving the Trustee to satisfy any unrelated claims.
The Escanaba believed that the negotiation of the asset purchase agreement (which preceded the entry of Order No. 809) was a sale of the Connecting Line, and it demanded the right to match the Soo’s offer. This was not easy — not only because the Soo had made a general bid not broken down by segment of track but also because the Soo wanted the Milwaukee system as a unit. The Trustee of the Milwaukee refused to sever the Connecting Line from the package, and the Escanaba instituted an arbitration under § 24.1 of the trackage rights agreement. The Escanaba asked the district court to carve the Connecting Line out of the rights to be transferred to the Soo; the Trustee replied that the transfer would bind the Soo to the provisions of the trackage rights agreement (including the right of first refusal), although the Trustee also maintained that the sale of the Milwaukee as a unit did not trigger the Escanaba’s right of first refusal. Shortly before the entry of Order No. 809, the panel of arbitrators concluded that the sale to the Soo violated the Escanaba’s right of first refusal, and it called for further proceedings to fix a valuation on the Connecting Line. The Trustee obviously could not convey the Connecting Line after the sale to the Soo, and the Escanaba wanted the line rather than damages. So the Escanaba asked the district court to substitute the Soo for the Milwaukee as its adversary in the arbitration. The district court granted the motion, and the Soo has appealed.
Our initial hurdle is jurisdictional. The Soo portrays the order as one compelling arbitration under 9 U.S.C. § 4, which it calls “final.” But an order compelling parties to arbitrate is not a “final” decision. More remains to be done, and the grant of a request to arbitrate is not much different from setting a case for trial. There are hundreds of case-management orders in a large piece of litigation, any of which may affect the outcome, and almost none of which is appealable. See Tenneco Inc. v. Saxony Bar & Tube, Inc., 776 F.2d 1375, 1378-79 (7th Cir.1985). Through a “fluke in the law” (see Graphic Communications Union v. Chicago Tribmie Co., 779 F.2d 13, 15 (7th Cir.1985)), the genesis of which we need not explore, an order to arbitrate is nonetheless appealable if it terminates all proceedings in the district court. Whyte v. THInc Consulting Group Int’l, 659 F.2d 817, 818 n. 2 (7th Cir.1981). Order No. 816, which substituted the Soo for the Milwaukee in the arbitration, did not terminate all proceedings; it is a step in a complex reorganization, best understood as a construction of Order No. 809 and the asset purchase agreement. The substitution therefore is not appealable as an order to arbitrate.
It is nonetheless appealable as an order in the reorganization. Under the Bankruptcy Act of 1898, which applies to this case, any interlocutory order in a “proceeding” could be reviewed on appeal. See Section 24(a), 11 U.S.C. § 47(a) (1976 ed.). *834 This statute does not allow review of interlocutory orders in “controversies,” which are distinct legal disputes such as tort suits against the bankrupt firm. But when the interlocutory order occurs in a “proceeding,” a part of the main bankruptcy case, it is reviewable subject only to an exception for “trivial” orders. We held that the Grand Trunk R.R. may appeal under § 24(a) from the district court’s decision to allow the Soo to take part in the bidding for the Milwaukee’s lines, see In re Chicago, Milwaukee, St. Paul & Pacific R.R., 756 F.2d 508, 511-13 (7th Cir.1985), and for the same reasons the Soo may appeal from Order No. 816. The order is part of the reorganization process rather than an ancillary “controversy” and is not “trivial.”
So we must decide whether the Soo is bound by the right of first refusal in the trackage rights agreement between the Milwaukee and the Escanaba. It is. It purchased the railroad assets of the Milwaukee as a bloc. One of the assets it acquired is the trackage rights agreement. The Soo does not want to be cut off from the Connecting Line, and it needed the trackage rights between Green Bay and Crivitz over the Escanaba’s line. The Soo vigorously denies that it acquired § 19.2 of the trackage rights agreement, the Escanaba’s right of first refusal. But there is no way it could acquire one part of the agreement without the rest, unless it be the provision of Order No. 809 stripping the transferred property of encumbrances. Section 19.2 is arguably an encumbrance on the Connecting Line and the Green Bay— Crivitz trackage rights. Yet Order No. 809 preserves encumbrances to the extent the asset purchase agreement allows, and that is fatal to the Soo’s position.
Section 12(f) of the asset purchase agreement binds the Soo to “[ojbligations under all contracts and leases relating to the Railroad”, and § 12(g) binds the Soo to “[ojbligations with respect to litigation and claims against the Milwaukee relating to the Railroad.” The trackage rights agreement is a “contract ... relating to” the Green Bay— Crivitz trackage rights, and the Escanaba’s demands are “claims against the Milwaukee relating to” the Connecting Line. Under the asset purchase agreement the Soo assumed these obligations of the Milwaukee.
The Soo’s response is that it assumed them only to the extent they affected the “Railroad,” which the agreement defines as “the rail operations and rail business conducted with the Rail Assets” of the Milwaukee. This implies the conduct of an ongoing railroad, the Soo insists, and if it sells the Connecting Line to the Escanaba it is no longer an ongoing rail operation of the Soo and therefore not part of the “Railroad,” as that term is defined. This is preposterous. The Connecting Line was part of the “rail business” of the Milwaukee; the right of first refusal relates to this line; the fact that the Connecting Line would not be part of the Soo’s rail business after it had been sold or abandoned does not remove it from the scope of the “Railroad” as of the date of the asset purchase agreement and Order No. 809. The Soo took many assets subject to defeasance. It took leases that will expire. It took a trackage rights agreement between Green Bay and Crivitz that may come to an end some day. That the Soo’s rights may have time limits does not mean that these rights and obligations are not part of the “Railroad.” Were it otherwise, we would soon hear the Soo argue that its lessors cannot enforce the time limits of its leases, for any termination of the lease would remove the leased property from the definition of the “Railroad” and therefore mean that all “encumbrances” (such as the limited duration of the Soo’s control) had been stripped off by Order No. 809.
The district court supervised the asset purchase agreement and entered Order No. 809. It heard the Trustee of the Milwaukee represent (without protest from lawyers of the Soo, who were present) that the agreement would bind the Soo to the right of first refusal in the trackage rights agreement. The district court best knows the meaning of its own orders. The meaning of these documents is reasonably clear; *835 even if it were not, we would defer to the district court’s construction of them. Cf. Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 831-32 (7th Cir.1985).
The arbitration was not stayed pending this appeal. The Soo asked for at least $5.2 million if it was to surrender the Connecting Line. In December 1985 the panel concluded that the portion of the price allocable to the Connecting Line was $485,000. It ordered the Soo to transfer the Connecting Line to the Escanaba for that price. A district judge in Minnesota enforced the award. Escanaba & Lake Superior R.R. v. Soo Line R.R., No. 3-85-1903 (D.Minn. Jan. 30, 1986). The Soo has transferred the line (and been paid). The ICC exempted the transfer from the approval requirement of 49 U.S.C. § 10901 but held open the possibility of ordering the Escanaba to give the Soo trackage rights over the Connecting Line. Northeast Wisconsin Railroad Transportation Commission, Fin. Dkt. No. 30760 (Jan. 7, 1986).
Our decision does not affect any defenses the Soo may have to the arbitrators’ award. We hold only that Orders No. 809 and 816, and the asset purchase agreement, transferred to the Soo the Milwaukee’s obligations under the trackage rights agreement. We do not decide what those obligations are. Whether there has been a violation of the trackage rights agreement, what the price for the Connecting Line may be, and whether the Soo may use the Connecting Line are matters for the arbitrators, the ICC, the district court in Minnesota, and the Eighth Circuit, under the terms of the trackage rights agreement, the Arbitration Act, 9 U.S.C. § 10, and other pertinent statutes.
Affirmed.