In the Matter of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Debtor.

Appeals of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Chicago Milwaukee Corporation, and Chicago, Milwaukee, St. Paul and Pacific Railroad Bond and Debenture Holders Protective Committee.

Nos. 85–2364, 85–2428.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1986.
Decided May 20, 1986.

Keith F. Bode, Jenner & Block, Chicago, Ill.; for appellant.

Lawrence P. Bemis, Kirkland & Ellis, Chicago, Ill., for appellee.

Before BAUER and POSNER, Circuit Judges, and MOODY, District Judge *.

POSNER, Circuit Judge.

In 1955 the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, known as the Milwaukee Road, issued $56 million in income debentures. The debenture indenture provided that the railroad would pay the holders of the debentures interest installments every year, at the rate of 5 percent, provided that the railroad had "available net income"—income in excess of various fixed expenses, in particular interest due secured creditors. This was to continue for 100 years, at the end of which time the principal would be repaid. In 1977 the railroad petitioned for reorganization under section 77 of the Bankruptcy Act, 11

* Hon. James T. Moody of the Northern District of Indiana, sitting by designation.

U.S.C. § 205 (1952 ed.) (which has since been repealed but remains applicable to this proceeding, see Bankruptcy Reform Act of 1978, Pub.L. 95–598, § 403(a), 92 Stat. 2683), precipitating an avalanche of litigation unnecessary to recount here; for a thumbnail sketch see *In re Chicago, Milwaukee St. Paul & Pac. R.R.*, 713 F.2d 274, 277–78 (7th Cir.1983). A month later the indenture trustee declared the debentures in default. After selling off many of the railroad's lines the Milwaukee Road's trustee in bankruptcy in 1985 sold the remaining lines to the Soo Railroad, see *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 756 F.2d 508 (7th Cir.1985), and turned over the proceeds to the CMC Real Estate Corporation, as the debtor has been renamed. CMC Real Estate Corporation is a wholly owned subsidiary of Chicago Milwaukee Corporation; to simplify exposition, we shall refer to parent and subsidiary interchangeably as CMC. With the proceeds of the various sales, and the nonrail assets (chiefly real estate) that have never been sold, CMC will emerge from bankruptcy with a net worth of more than $400 million after paying off all of the Milwaukee Road's creditors, including the debenture holders, at the highest valuation of their claims.

The issue is how much the debenture holders should receive. The district judge presiding over the reorganization held that they should receive the $56 million principal, plus interest on that principal for every year during which the debentures were in default—even though there was available net income sufficient to pay interest during only two of them—plus interest on this interest. The total is $92 million. CMC has appealed, contending that repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed. The interest for the two years in which there was available net income comes to $6 million. The present value of $56 million in 2055, when added to the present value of 5 percent interest for 70 years (2055–1985), is $24 million. (The dis-

count rate used to make this calculation was 12 percent; its correctness is not an issue in this appeal.) Hence CMC is arguing that the debenture holders should get the equivalent of $30 million ($24 million plus $6 million), rather than the $92 million that the judge awarded.

The debenture holders have cross-appealed, making two arguments. One, which we shall not have to address, is that the judge used too low an interest rate in computing the interest due on interest. The other is that the debenture holders are entitled to interest on the overdue principal at a rate higher than 5 percent.

We shall thus have to decide only four issues: whether repayment of the principal should have been accelerated, whether interest should have been allowed in years in which there was no available net income, whether if so 5 percent was the proper rate, and finally whether interest on interest should have been allowed.

1. The indenture provides that in the event of a default the indenture trustee shall be entitled to declare the principal immediately due and payable. There was a default; the trustee made the required declaration; hence the indenture by its terms entitled the debenture holders to receive the full $56 million in principal immediately rather than having to wait till the year 2055. Nevertheless they concede that the reorganization court had the power to make them wait ("decelerate"). *In re Atlanta Int'l Raceway, Inc.*, 513 F.2d 546, 549 n. 7 (5th Cir.1975). CMC argues that the court should have exercised this power—that because of the rise in interest rates since 1955, acceleration will confer an enormous windfall on the debenture holders, giving them $56 million when, but for the default, the present value of the debentures would be as we said only $24 million (and that only if they could be sure of receiving 5 percent interest every year from now to then). Many of the debenture holders bought the debentures at a tremendous discount from face value, after the inflationary rise in interest rates had reduced the debentures' market value—

though the risk of nonpayment of principal or interest or both may have been an even larger factor in the reduction. CMC has offered to give the debenture holders an ironclad guarantee that they will get 5 percent a year until 2055 and the full principal then; and given CMC's net worth, such a guarantee should not be hard to arrange. So the debenture holders will do no worse than if there had been no default.

■ Nevertheless, the district judge did not err in allowing acceleration. The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full. All of the Milwaukee Road's creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. The only competing equities are those of CMC's shareholders, and are weak, quite apart from the fact that many or for that matter all of them may have bought their shares after the Milwaukee Road went into bankruptcy and may therefore have lost nothing because of the bankruptcy—admittedly a fact that does not distinguish them from the debenture holders.

The important point is that back in 1955 the Milwaukee Road unequivocally promised to repay the principal of the debentures immediately in the event of a default (provided, for some forms of default, that the indenture trustee demanded immediate repayment, but he did so here, as we shall see), and the Milwaukee Road did default, and it can honor its promise without hurting any other creditor. In these circumstances the presumption in favor of acceleration is a strong one, perhaps conclusive, and certainly is not overcome by pointing out that some or even all of the debenture holders are speculators. The provision for acceleration was part of the consideration for the Milwaukee Road's being able to borrow money for 100 years without having to amortize the loan. The debenture holders got in exchange a distribution of possible outcomes: probably they would receive interest for 100 years and the principal at the end of that time, but possibly they would get their principal back sooner. CMC proposes to truncate that distribution.

What it describes as a windfall gain to the debenture holders is simply the coming to pass of one of the contingencies for which they or their predecessors bargained. If you pay $1 for a lottery ticket and win $1,000 in the lottery, your winnings are not a windfall; you bought the chance to get them. The debenture holders bought the chance to get the principal back early, at a time when a rise in interest rates might enable them to reinvest it more advantageously elsewhere, as they will now be able to do. This chance was a hedge against the risk of lending money for 100 years at a fixed interest rate. A sharp rise in interest rates might (as it did) signify a general disturbance of business conditions which would make the Milwaukee Road more likely to default; and if it did default, the debenture holders would be able to reinvest the principal of the debentures at the then higher rates. If the original debenture holders bought this right, then the current holders acquired it, for value, when they bought the debentures; enforcing the right will therefore confer no windfall on the current holders either.

The indenture provided for acceleration not only if there was a default but also if there was a purely voluntary liquidation. The Milwaukee Road's stockholders might well have decided to liquidate the corporation after the sale of its remaining assets to the Soo; for what remained was not an enterprise but a portfolio. If they had liquidated they would have had to repay the $56 million immediately. Maybe they did not liquidate because if the principal is not accelerated they will have 70 years of 5 percent money to play with (admittedly, tax considerations may also have played a role in this decision). It is not the objective of the bankruptcy laws to confer windfalls on debtors. See Blum, *Full Priority and Full Compensation in Corporate Reorganizations: A Reappraisal,* 25 U.Chi.L.Rev. 417, 423 (1958).

**528**

CMC's appeal to equity is misplaced for another reason. The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. See *Shondel v. McDermott*, 775 F.2d 859, 867–68 (7th Cir.1985); *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 939 (7th Cir. 1984) (concurring opinion). The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted. See *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565 (7th Cir.1986). Hence if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights; and one of those rights in this case was the right to accelerate the repayment of principal.

2. The issue with regard to interest in years when the railroad had no available net income requires close consideration of several provisions of the indenture. Article V sets forth the method of determining available net income. Section 6 thereof states: "The provisions of this Article V are hereby made expressly subject to each and all of the remedies of the Trustee or the Debentureholders as set forth in Article XI, and the operation of the provisions of this Article V shall be suspended during the continuance of either of the Events of Default specified in clause (a) or clause (b) of Section 2 of Article XI." We go to Article XI, and find that clause (a) relates to defaults in the payment of the principal of the debentures "when the same shall become due and payable either by the terms thereof or otherwise as herein provided," while clause (b) relates to defaults in the payment of any installment of interest "when and as such interest shall become due and payable as therein and in the Indenture expressed and such default shall continue for 60 days." The indenture trustee, however, declared the Milwaukee Road's default under another clause of Article XI, clause (f), which relates to the institution of bankruptcy proceedings, and which is not mentioned in Article V. CMC argues that since the default was declared under clause (f), the provisions regarding available net income were not suspended, and hence the debenture holders are not entitled to income during any year of reorganization in which the railroad lacked available net income.

Notice that section 6 of Article V, quoted above, has two clauses. The second (beginning "and the operation ...") provides for automatic suspension of the provisions on available net income if the railroad defaults in paying either principal or (for 60 days) interest; the suspension begins at the moment of default in the case of a default in principal and on the 61st day following default in the case of a default in interest. The first clause of section 6, however, merely subjects Article V to the remedies that the trustee and the debenture holders have under Article XI, and thus is not self-executing. Article XI provides that in the event of a default other than in the payment of principal, the trustee may, and if the holders of at least 25 percent of the face amount of the debentures so request must, declare the principal to be due and payable immediately. This is the acceleration clause, on which the district judge based his ruling that CMC must repay the principal without waiting till the year 2055.

A month elapsed between the petition for bankruptcy and the indenture trustee's demand for repayment of principal on the ground of a clause (f) default, and the debenture holders concede that the provisions on available net income were not suspended until that demand was made. They argue, however, correctly in our view, that when the Milwaukee Road did not repay the principal in response to the demand made pursuant to clause (f), this placed the Milwaukee Road in default under clause (a) (refusal to repay principal "when the same shall become due and payable either by the terms thereof or otherwise as herein provided"); the second clause of Article V, section 6 therefore

kicked in; and from that moment on, the provisions on available net income were suspended by the express terms of section 6. The indenture trustee could not have invoked clauses (a) or (b) in the first instance, because until the Milwaukee Road declared bankruptcy the principal of the debentures was not due and neither was interest, for the railroad had no available net income at the time. But once the Milwaukee Road petitioned for bankruptcy, the trustee could and did declare a default under clause (f), which accelerated the principal, thereby precipitating a default under (a), which caused the provisions on available net income to be suspended.

It is not a good answer that, once bankruptcy was declared, a default under (a) was impossible because the debtor could not have repaid the principal immediately even if it had wanted to do so. Defaults often are involuntary. The purpose of clause (a) is not to guarantee that the principal will be repaid immediately, because that might be impossible, but to accelerate repayment as much as possible. The indenture contemplates that repayment may indeed not follow immediately upon default: Article XI provides that in the event of a default in principal, interest shall be payable on the overdue principal at the rate of 5 percent. There is no reference to available net income. When the trustee exercised his right under Article XI to declare the principal immediately due and payable, the principal began to accrue interest at 5 percent regardless of available net income; and that is the interest which the district judge awarded for the period until the principal is repaid.

All this seems eminently sensible. Once the principal is accelerated by the declaration of a default, it becomes a matter of very little interest to the debenture holders whether the railroad has available net income. The contract has been broken, they want out, and they negotiated for 5 percent interest on their overdue principal until they got out.

■ We have not forgotten the venerable principle that a bankruptcy court can refuse to award interest that accrues on a creditor's claim after the petition for bankruptcy is filed. See, e.g., *Sexton v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911) (Holmes, J.); *New York v. Saper*, 336 U.S. 328, 330–32, 69 S.Ct. 554, 555–57, 93 L.Ed. 710 (1949). But it is designed for cases where there is not enough money to pay all the creditors—so that there is a question whether one creditor should get interest while another doesn't even recover principal—and not for cases like this, where the debtor is solvent. See *Ruskin v. Griffiths*, 269 F.2d 827, 830–31 (2d Cir. 1959); *In re Manville Forest Products Corp.*, 43 B.R. 293, 300 (Bankr.S.D.N.Y. 1984). It can be argued that the principle casts light on the question whether the contract was intended to apply to a default that ends up in bankruptcy court. But we think it was. The parties provided expressly for interest on overdue principal, and though the debenture holders must have known there was a chance that this contractual right would not be enforced in bankruptcy, they did everything they could to maximize the likelihood that it would be.

■ 3. The debenture holders want more than 5 percent, but we think the district court was right to reject this request. The contract is the measure of their rights. Whatever rights to prejudgment interest they might otherwise have are merged in their contractual understanding. As will become clear from our analysis of the fourth issue, the fact that if the default had occurred outside of bankruptcy the debenture holders might have collected the overdue principal faster and therefore have been able to invest it at a higher interest rate (the current market rate) does not alter this conclusion.

4. The district judge awarded the debenture holders interest on the 5 percent interest installments that had accrued but had not been paid, from the date of accrual. (Interest on interest may seem a detail, but is not; it could be as much as $15 million if the debenture holders' contentions with regard to the proper rate of interest were accepted.) His analysis of this question

was exceedingly terse; essentially he treated the date of accrual of each installment as if it were the date on which a judgment or its equivalent had been entered against the Milwaukee Road. Actually they were just the due dates of the installments.

■ To repeat an earlier point, which indeed is the main point in this opinion, when the debtor is solvent the judicial task is to give each creditor the measure of his contractual claim, no more and no less. Cf. *Ruskin v. Griffiths, supra*, 269 F.2d at 831. By this standard the debenture holders have no right to interest on interest. The exact language of the acceleration clause is that in the event of a default in paying either principal or interest the railroad will, upon the indenture trustee's demand, pay him "the whole amount then due and payable on such Debentures and coupons, for principal or interest, or both, as the case may be, with interest on the overdue principal at the rate of 5% per annum...." Both the overdue principal and the overdue interest must be paid but only the former shall carry interest. All events of default are covered; and we know that the indenture specifies that one such event is declaring bankruptcy. It is inconceivable that the only default contemplated in the provision on overdue principal and interest was one that did not involve bankruptcy. Not only does the indenture expressly contemplate the possibility of bankruptcy, but that possibility must have been pointedly present to the minds of the draftsmen given the history of the Milwaukee Road. It had been placed in an equity receivership (the equivalent of bankruptcy) in 1925, see *Chicago, M., St. P. & P.R. Co. v. United States*, 33 F.2d 582, 584 (N.D.Ill. 1929), had emerged in 1928, and had entered reorganization in bankruptcy in 1935, not to emerge till the 1940s, see *In re Chicago, M., St. P. & P.R. Co.*, 36 F.Supp. 193 (N.D.Ill.1940), rev'd, 124 F.2d 754 (7th Cir.1941), rev'd in part, under the name of *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943)— so that in 1955 it had been out of reorganization for only a few years.

Another reason to think the omission to require interest on interest deliberate is that under the law of Illinois, which would govern a dispute over the meaning of the indenture since it was negotiated and signed in Illinois and no other state has a closer connection to the negotiation or performance of the indenture, interest on interest will not be awarded in a breach of contract action unless expressly provided for in the contract. See *Harrington v. Kay*, 136 Ill.App.3d 561, 569-70, 91 Ill.Dec. 214, 221, 483 N.E.2d 560, 567 (1985), and cases cited there. Hence the debenture holders could not have thought it likely that if the indenture was silent on whether they were entitled to interest on interest, they could still obtain it in a suit growing out of a default. It is true of course that prejudgment interest is generally allowed in cases where the plaintiff's claim is for a fixed sum; and that would describe not only the indenture trustee's claim for overdue principal but also his claim for overdue interest at the rate fixed in the indenture (5 percent). But *Harrington v. Kay* shows that the courts of Illinois make an exception for the case where, since the underlying claim is a claim for interest, the prejudgment interest would be interest on interest, which is sufficiently disfavored (for reasons unclear to us) to require that the plaintiff negotiate for it explicitly if he wants to get it. One may wonder why, since prejudgment interest on principal is allowed, the indenture bothers to provide expressly for interest on overdue principal; that is just another name for prejudgment interest. But apart from wanting to make assurance doubly sure (a desire that explains much apparently superfluous language in contracts), the indenture fixes the prejudgment interest rate at 5 percent.

If this had been a simple default, then, the debenture holders would not have gotten interest on overdue interest; why should they do better merely because the Milwaukee Road exercised its statutory right to declare bankruptcy? A possible answer is that bankruptcy takes longer than a simple collection case. If the Mil-

waukee Road had simply defaulted, the debenture trustee would have accelerated repayment of the overdue principal and distributed it to the holders of the debentures, who would have invested it and earned compound interest. Of course we cannot be sure that every cent would have been invested rather than used for consumption, but that does not matter; a rational person will forgo an interest-producing investment only if consumption yields him more utility, and in that case the loss of interest is a minimum estimate of his actual loss. The bankrupt corporation was allowed to appropriate this benefit during the reorganization proceeding. Not to compel payment of interest on interest thus gives the bankrupt an incentive to spin out the reorganization proceeding, something we don't need, cf. Blum, *Treatment of Interest on Debtor Obligations in Reorganizations Under the Bankruptcy Code*, 50 U.Chi.L.Rev. 430, 432 (1983), and gives the creditor less in present-value terms than he would have had if there had been no such proceeding, cf. *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir.1935) (L. Hand, J.); Baird & Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy*, 51 U.Chi.L.Rev. 97, 115–16, 126–28 (1984).

Nevertheless there are compelling objections to awarding interest on interest in this case. One is that to award it from the date of original default, as sought by the debenture holders, would give them a windfall, for they would not have obtained the principal and begun investing it (at compound interest) the very day it became overdue. Collection proceedings are not instantaneous, especially with a debt of $56 million—a bit too large for small-claims court. The debenture holders knew this; there would have been no reason to provide in the indenture for interest on overdue principal if they had been confident of being able to collect the principal in full the day it became overdue. The potential for delay in paying overdue interest was particularly great since the railroad's obligation

to pay interest depended on the intricacies of the available-net-income concept; the debenture trustee might have had to sue to enforce his entitlement to the overdue interest. He was not in the position of a secured creditor who could seize assets of the debtor to collect his claim. And as we said earlier he could not have gotten prejudgment interest on the interest part of his claim; he would have had to wait till judgment was entered before interest on interest began to accrue.

All this leaves quite speculative the question how much interest the debenture holders actually lost by virtue of the fact that the default was precipitated by a bankruptcy. That depends as we have said on how long it would have taken their trustee to enforce any claim to overdue interest in the event of a nonbankruptcy default.

The objections go deeper. We have said that in the case of a solvent bankrupt the bankruptcy court should be guided by the contract between the bankrupt and its creditors rather than by distinct principles of equity jurisprudence. Not only does the debenture indenture not entitle the holders of the debentures to interest on interest in the case of an ordinary default, but there is reason to believe that they were compensated for relinquishing any such contractual entitlement in bankruptcy as well. Back in 1955, with *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), which had held that the payment of interest on interest was contrary to the equitable principles of bankruptcy, only eight years old, it could not have seemed likely that interest on interest would be awarded if the Milwaukee Road again went into bankruptcy. Granted, *Vanston* was not a solvent-debtor case. *Debentureholders Protective Comm. v. Continental Investment Corp.*, 679 F.2d 264, 271–72 (1st Cir.1982), was, and hinted strongly that the debenture holders there were entitled to interest on interest. But even if that decision had been anticipated in 1955, how likely was it that if the Milwaukee Road went broke again, it would emerge from bankruptcy

able to pay all of its creditors in full? The holders of the debentures had to be thinking about the possibility of bankruptcy, and its attendant delays in repaying creditors; must therefore have assumed the risk that they would not get compound interest if there was a bankruptcy; and presumably were compensated for bearing this risk by some other term in the debenture indenture.

■ Awarding interest on interest in this case also would circumvent Illinois' policy of not awarding prejudgment interest on interest unless the contract sued on provides expressly for such interest. The Supreme Court held in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), that a bankruptcy court is not allowed to give a creditor rights that state law has withheld from him. Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law. The debenture holders are asking for a right to prejudgment interest that Illinois law does not give them.

*Butner* casts something of a shadow over the First Circuit's *Debentureholders* decision, which, without citing *Butner*, suggested that the debenture holders might have a right to interest on interest even though the applicable state law, as in this case, did not recognize such a right. After *Butner*, the *Vanston* decision seems to stand for the proposition not that federal law controls the creditor's right to interest in bankruptcy, but that the creditor's right may be cut down as a matter of equity if that is necessary for the protection of competing creditors (*Sexton*); the right itself, however, is created by state, not federal, law. See *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 436–39 (6th Cir.1982).

Our conclusion regarding interest on interest is also pertinent to the debenture holders' argument (issue 3) that they should get interest on the overdue principal at a greater than 5 percent rate because if they had collected a state court judgment for the overdue principal they could immediately have invested it at the current interest rate, which was much higher than 5 percent. True enough, but they could also have negotiated in the indenture for payment of interest on overdue principal at market rates rather than a fixed 5 percent rate. Perhaps anticipating (extraordinary as this may seem in 1986) that interest rates would fall below 5 percent, they rejected this option. They must be held to their choice.

To summarize, the district judge was right to accelerate the repayment of principal and give the debenture holders 5 percent interest on that principal without regard to available net income, so these parts of his decision are affirmed. But he was wrong to order the payment of interest on those past-due interest payments, and this part of his decision is reversed, and the case remanded to the reorganization court for the entry of a new judgment, subtracting the interest on interest. Each party shall bear its own costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.